J-S31041-16

2016 PA Super 136

| | | |
|---|---|---|
| ADAM C. COLEMAN, | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| v. | : | |
| | : | |
| OGDEN NEWSPAPERS, INC., D/B/A THE | : | |
| LOCK HAVEN EXPRESS; OGDEN | : | |
| PUBLICATIONS OF PENNSYLVANIA, | : | |
| INC.; ROBERT O. ROLLEY; AND JAMES | : | |
| E. RUNKLE, | : | |
| | : | |
| Appellees | : | No. 1970 MDA 2015 |

Appeal from the Order October 8, 2015
in the Court of Common Pleas of Clinton County
Civil Division at No(s): 1141-2012

BEFORE:    SHOGAN, OTT, and STRASSBURGER,* JJ.

OPINION BY STRASSBURGER, J.:                    **FILED JUNE 28, 2016**

Adam C. Coleman appeals from the order that dismissed his complaint after granting the motion for summary judgment filed by Ogden Newspapers, Inc. d/b/a The Lock Haven Express (*The Express*), Ogden Publications of Pennsylvania, Inc., Robert O. Rolley, and James E. Runkle (Defendants, collectively).[1]  We affirm.

Coleman was Chairman of the Clinton County Commissioners and an elected member of the Pennsylvania State Democratic Committee.

---

[1] It is unclear why the trial court dismissed the complaint, as it would following the sustaining of preliminary objections, where the typical result of the grant of a motion for summary judgment is the entry of judgment in favor of the moving party.  Coleman does not question this procedural irregularity on appeal.

*Retired Senior Judge assigned to the Superior Court.

Amended Complaint, 10/29/2012, at 5. On September 30, 2011, Coleman was arrested along with Jerry Clark and Coleman's mother, Kim Coleman. The Office of the Attorney General (OAG) issued the following press release concerning the arrests.

**Former Executive Director of Lock Haven YMCA and two others charged in connection with theft of funds**

HARRISBURG - Agents from the Attorney General's Bureau of Criminal Investigation have arrested three Central Pennsylvania residents, including the former Executive Director of the Lock Haven Area YMCA, who are accused of theft or conspiracy in connection with the diversion of more than $100,000 in YMCA funds.

Attorney General Linda Kelly identified the defendants as Jeremiah M. Clark, … Adam C. Coleman, … and Kimberly Ann Coleman….

"Clark allegedly schemed to use his official position with the YMCA to misappropriate at least $133,000 in agency funds between 2006 and 2010," Kelly said. "Clark allegedly forged the names of YMCA board members on checks and trust fund documents, fabricated receipts and invoices to support those bogus checks and used agency credit cards and funds for a wide variety of personal expenses."

According to the criminal complaint, Clark allegedly used YMCA funds to purchase Penn State football tickets, a riding mower, televisions, a family pet, partial payment for jet skis, a hot tub, travel and lodging, a home entertainment center and a campaign advertisement for Adam Coleman.

Kelly said that Adam Coleman is accused of conspiring with Clark in some of the thefts, including the fabrication of an invoice for $1,465 in landscaping work, which was paid by the YMCA. The funds were allegedly used to pay Coleman's bill at the Clinton County Country Club.

According to the criminal complaint, Coleman and Clark also used their leadership positions with the Lock Haven Area Elks Lodge to apply for a $5,300 grant from the National Elks Foundation, supposedly to support an after[-]school program for children at the YMCA.  Instead of funding that after-school program, Clark and Coleman allegedly created fake invoices for items that they had supposedly purchased and wrote checks to themselves as reimbursement - withdrawing nearly $5,200 from the grant account within a matter of months.

Kelly said that Kimberly Coleman, the mother of Adam Coleman, is accused of conspiring with the other defendants to fabricate an invoice for landscaping services which was allegedly used to divert $1,465 in YMCA funds in order to pay Adam Coleman's country club bill.

\* \* \*

Adam C. Coleman is charged with one count of theft by unlawful taking, a third-degree felony punishable by up to seven years in prison and a $15,000 fine[].

Adam Coleman is also charged with one count each of theft by deception and criminal conspiracy, both first-degree misdemeanors which are each punishable by up to five years in prison and $10,000 fines.

\* \* \*

The defendants were all preliminarily arraigned today before Renovo Magisterial District Judge Fran P. Mills.  … Coleman was released on $15,000 unsecured bail….

\* \* \*

(A person charged with a crime is presumed innocent until proven guilty.)

Motion for Summary Judgment, 8/14/2014, at Exhibit 1.

As a result, *The Express* published an online news article concerning the charges:

**Ex-YMCA director, two others indicted**

LOCK HAVEN - A former director of the local YMCA, a sitting Clinton County commissioner and his mother have been charged with criminal counts related to the alleged theft of more than $100,000 in funds from the YMCA, authorities said. Agents from the Attorney General's Bureau of Criminal Investigation on Friday arrested Jeremiah "Jerry" M. Clark…; Adam C. Coleman…' and his mother, Kimberly Ann Coleman…, according to Attorney General Linda Kelly. Adam Coleman is a sitting Clinton County commissioner. See today's print edition of *The Express* for a full story on the charges, including details of the Attorney General's allegations in this ongoing investigation that included a grand jury.

Motion for Summary Judgment, 8/14/2014, at Exhibit 2.[2] The referenced print edition for Saturday and Sunday, October 1 and 2, 2011, sported the headline "Clark, Colemans Charged" for an article attributed to "staff reports." *Id.* at Exhibit 4. That article included the same information as the online news alert along with additional details about the prosecution's allegations.

As advertised on the front page of the print edition, *The Express* also published a two-column response from Coleman's attorney, which appeared

---

[2] Coleman claims that *The Express*'s first publication about the charges was a breaking news alert that bore the headline "Three Central Pennsylvania Residents, Including The Former Executive Director of the Lock Haven Area YMCA [Are] Accused Of Theft Or Conspiracy In Connection With The Diversion Of More Than $100,000 In YMCA Funds." Coleman's Brief at 9. However, the corresponding citation he offers is to paragraph 32 of his amended complaint, wherein he makes the same allegation. Coleman fails in his brief to point us to the location in the record of a reproduction of any September 30, 2011 article with the headline quoted by Coleman. Its absence does not impact our disposition, as nothing Coleman contends was included in the missing publication would cause us to reach a different result.

alongside the bulk of the article about the charges. That response included the following:

> Mr. Coleman is innocent of the allegations that have been made against him and is confident that he will be fully exonerated when a jury of his peers are permitted to hear the facts, rather than the unfounded and one-sided allegations of the [OAG].
>
> * * *
>
> Mr. Coleman believes he has been dragged in to this matter as a result of a deal made by the [OAG] with Mr. Clark to try to implicate Mr. Coleman in some alleged wrongdoing in exchange for a reduction in Mr. Clark's charges or eventual punishment for those crimes, which include forgery and theft from the YMCA. In addition, Mr. Coleman believes the timing of the charges, which are being prosecuted by the Republican-controlled [OAG] are politically motivated.
>
> * * *
>
> The recent headline published in the Lock Haven *Express* website states that Mr. Coleman and his mother have been charged along with Mr. Clark for diverting more than $100,000 from the YMCA. These alleged facts are both false and misleading. Mr. Coleman is unaware as to the amount of funds Mr. Clark has been charged with diverting. However, the charges levied against Mr. Coleman and his mother only involve allegations of funds in the amount of $3,899.33, a substantial portion of which relate to a loan made to Mr. Coleman by Mr. Clark that was fully repaid back in December 2009.
>
> In the coming days, additional facts and updates will be distributed and posted at a website that has been established to ensure the public is provided with complete and transparent information about this matter. That website address is http://www.believeincoleman.com.

*Id.*

Following Coleman's claims of false and misleading reporting, defendant James Runkle, staff writer for *The Express*, reviewed the police report and the affidavit of probable cause that was filed against Coleman. The criminal complaint alleged theft by unlawful taking, theft by deception, and criminal conspiracy to commit theft by deception with Jerry Clark and Kim Coleman. The affidavit of probable cause which accompanied the criminal complaint included, *inter alia*, the following:

> The information contained in this affidavit is filed based upon information received from Special Agent R. Kirby Conrad….
>
> * * *
>
> … Special Agent Conrad found that grant money from the Elks National Foundation for an after school program at the YMCA was misappropriated by Jerry Clark and Adam Coleman. Special Agent Conrad's investigation also revealed that Adam Coleman's 2008 account balance at the Clinton Country Club was paid in February 2009 with misappropriated money from the YMCA. Special Agent Conrad['s] investigation further showed that Jerry Clark, Adam Coleman and Kim Coleman conspired to create false documentation to conceal that YMCA money was used to pay Adam Coleman's country club debt. Special Agent Conrad's investigation also shows that Kim Coleman knowingly gave false, material information to [Special Agent Timothy Shaffer] in a written statement concerning work done at the YMCA by Adam and Christopher Coleman and a false Coleman's Landscaping invoice.

*Id.* at Exhibit 6. The affidavit detailed Agent Conrad's discovery that Coleman and Clark deposited a $5,300 check from the Elks National Foundation into an account they had opened requiring both of their signatures, and promptly wrote checks to themselves to pay fake invoices.

*Id.,* Affidavit of Probable Cause at 2. It further described evidence and conversations with Coleman about a fraudulent landscaping invoice paid to Coleman by Clark with YMCA funds, including Coleman's statements "I know I took YMCA money" and "I know it wasn't right." *Id.*, Affidavit of Probable Cause at 8.

Accordingly, *The Express* continued to publish stories about the charges against Coleman (including in articles about Clark's guilty plea and sentence, *id.* at 27 and 29, and Kim Coleman's jury conviction and sentence, *id.* at 32 and 33), culminating in a front-page headline of "NOT GUILTY" under which is a photo of Coleman and the article "Adam Coleman acquitted on all charges." *Id.* at Exhibit 45.

Coleman filed a complaint and amended complaint against Defendants, claiming defamation and false light. Defendants moved for summary judgment, claiming, *inter alia*, that Coleman lacked evidence to establish that Defendants acted with actual malice. The trial court declined to rule on the motion pending further discovery. Thereafter, Defendants renewed their motion, and the trial court granted the motion and dismissed Coleman's amended complaint by order of October 8, 2015.

Coleman timely filed a notice of appeal. The trial court ordered Coleman to file a concise statement of errors complained of on appeal in accordance with Pa.R.A.P. 1925(b). In response, Coleman filed a 16-page document which contained 15 pages of factual history, argument, case law,

and excerpts of deposition transcripts.[3] In this statement Coleman

eventually did raise the two errors he alleges on appeal:

> 1. Did the trial court err and/or abuse its discretion by finding that [Coleman] failed to present sufficient record evidence from which the jury could conclude that [] Defendants acted with actual malice?
>
> 2. Did the trial court err and/or abuse its discretion by failing to consider Defendants' republication of their false statements after receipt of their falsity as *per se* "circumstantial evidence of actual malice for the cause of action against [the publisher] to survive [its] motion for summary judgment" pursuant to the Pennsylvania Supreme Court's holding in *Weaver v. Lancaster Newspapers, Inc.*, 926 A.2d 899, 905 (Pa. 2007)?

Coleman's Brief at 5 (trial court answers omitted).

We begin our consideration of Coleman's questions mindful of the

following.

> Our scope of review of an order granting summary judgment is plenary. [W]e apply the same standard as the trial court, reviewing all the evidence of record to determine whether there exists a genuine issue of material fact. We view the record in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party. Only where there is no genuine issue as to any material fact and it is clear that the moving party is entitled to a judgment as a matter of law will summary judgment be entered.
>
> Motions for summary judgment necessarily and directly implicate the plaintiff's proof of the elements of his cause of action. Thus, a record that supports summary judgment will either (1) show

---

[3] Such prolixity violates the provisions of Pa.R.A.P. 1925(b)(4). However, because the trial court's preparation of its Rule 1925(a) opinion was not hampered by Coleman's noncompliance, we decline to find waiver under Pa.R.A.P. 1925(b)(4)(vii).

the material facts are undisputed or (2) contain insufficient evidence of facts to make out a *prima facie* cause of action or defense and, therefore, there is no issue to be submitted to the [fact-finder]. Upon appellate review, we are not bound by the trial court's conclusions of law, but may reach our own conclusions. The appellate Court may disturb the trial court's order only upon an error of law or an abuse of discretion.

*DeArmitt v. New York Life Ins. Co.*, 73 A.3d 578, 585-86 (Pa. Super. 2013) (internal quotation marks and citations omitted).

Coleman's amended complaint stated claims under the theories of defamation and false light. Accordingly, we review the applicable principles of law.

"Defamation is a communication which tends to harm an individual's reputation so as to lower him or her in the estimation of the community or deter third persons from associating or dealing with him or her." *Moore v. Cobb-Nettleton*, 889 A.2d 1262, 1267 (Pa. Super. 2005) (internal quotation marks and citation omitted). *See also* 42 Pa.C.S. § 8343(a) (providing elements of the cause of action). "Under Pennsylvania's common law regime, the defendant was strictly liable for the publication of a defamatory statement unless he could prove that the statement was true." *Am. Future Sys., Inc. v. Better Bus. Bureau of E. Pennsylvania*, 923 A.2d 389, 396 (Pa. 2007). However, the United States Supreme Court, beginning with *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964), began applying the First Amendment to the states' enforcement of legal remedies for defamation. *Id.* at 397.

Based upon the constitutional protections for freedom of speech, Coleman, a public figure,[4] bore additional burdens of proof in this case. He was required to prove as part of his case in chief that the statements published by Defendants are objectively false. *Lewis v. Philadelphia Newspapers, Inc.*, 833 A.2d 185, 191 (Pa. Super. 2003) ("If the statement in question bears on a matter of public concern, or the defendant is a member of the media, First Amendment concerns compel the plaintiff to prove, as an additional element, that the alleged defamatory statement is in fact false."). Further, Coleman had to prove that, at the time Defendants published the statements, they acted with the subjective state of mind of actual malice: that Defendants either knew they were publishing falsehoods or published them with reckless disregard for whether they were false. *Id.* ("If the plaintiff is a public official or public figure, [he or] she must prove also that the defendant, in publishing the offending statement, acted with actual malice, *i.e.* with knowledge that [the statement] was false or with reckless disregard of whether it was false or not." (internal quotations omitted)).

As with defamation, the elements of a claim for false light include knowledge of, or reckless disregard for, the falsity of a publication:

---

[4] Coleman has acknowledged that he is a public figure. *See*, *e.g.*, Coleman's Memorandum of Law, 9/9/2014, at 17 (referring to the instant case as "a public figure defamation case").

- 10 -

One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if

(a) the false light in which the other was placed would be highly offensive to a reasonable person, and

(b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.

Restatement (Second) of Torts § 652E.[5]

The issue before us in this appeal is whether the trial court erred in

concluding that Coleman failed to come forth with sufficient evidence to

---

[5] The Restatement offers the following explanation of the relationship of false light and defamation.

The interest protected by this Section is the interest of the individual in not being made to appear before the public in an objectionable false light or false position, or in other words, otherwise than as he is. In many cases to which the rule stated here applies, the publicity given to the plaintiff is defamatory, so that he would have an action for libel or slander…. In such a case the action for invasion of privacy will afford an alternative or additional remedy, and the plaintiff can proceed upon either theory, or both, although he can have but one recovery for a single instance of publicity.

It is not, however, necessary to the action for invasion of privacy that the plaintiff be defamed. It is enough that he is given unreasonable and highly objectionable publicity that attributes to him characteristics, conduct or beliefs that are false, and so is placed before the public in a false position. When this is the case and the matter attributed to the plaintiff is not defamatory, the rule here stated affords a different remedy, not available in an action for defamation.

*Id.* at Comment b.

meet his burden of production as to the actual-malice prongs of his defamation and false light claims.

> The question whether the evidence in the record in a defamation case is sufficient to support a finding of actual malice is a question of law. This rule is premised on the unique character of the interest protected by the actual malice standard. More fundamentally, the rule is derived from the recognition that [j]udges, as expositors of the Constitution, must independently decide whether the evidence in the record is sufficient to cross the constitutional threshold that bars the entry of any judgment that is not supported by clear and convincing proof of actual malice.

*Joseph v. Scranton Times L.P.*, 129 A.3d 404, 436 (Pa. 2015) (internal quotation marks and citations omitted). "Clear and convincing evidence is the highest burden in our civil law and requires that the fact-finder be able to come to clear conviction, without hesitancy, of the truth of the precise fact in issue." *Weissberger v. Myers*, 90 A.3d 730, 735 (Pa. Super. 2014).

> To establish actual malice, there must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. Failure to investigate, without more, will not support a finding of actual malice, nor will ill will or a desire to increase profits. The fact that [the publisher] could have employed a higher degree of journalistic responsibility does not constitute actual malice. Mere negligence or carelessness is not evidence of actual malice or malice in fact. Finally, in a situation such as this, when the plaintiff's position is not determinative on an issue, the communication of a denial by a plaintiff does not usually constitute evidence of actual malice.

*Manning v. WPXI, Inc.*, 886 A.2d 1137, 1144 (Pa. Super. 2005). "Actual malice can be shown when the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation, or

where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports." **Weaver**, 926 A.2d at 903.

The trial court offered the following explanation for its determination that Coleman failed to produce evidence that, if believed by the fact-finder, would constitute clear and convincing proof of actual malice.

> [Coleman] contends Defendants suggested that he was involved in diversion of more than $100,000 in YMCA funds when, in fact, he was charged only with the diversion of $1,465.00 in YMCA funds. [Coleman] further contends Defendants continually suggested that he conspired to defraud the Lock Haven Elks when no conspiracy count regarding the Elks was included in the original criminal complaint or the information.
>
> While it is true that [Coleman] was only charged with diverting $1,465.00 from the YMCA, his alleged conspirator having taken the rest of the funds, the information as filed did charge [Coleman] with "[c]onspiracy" regarding the YMCA with respect to the $1,465.00.
>
> With respect to the Elks, while counsel correctly points out that [Coleman] was "never charged with conspiracy with Mr. Clark for theft of any funds from the Lock Haven Elks," he was charged with theft of $5,300.00 based upon allegations concerning activities of [Coleman] and a third party.
>
> While not the best reporting, all of the articles referenced by [Coleman] were merely attempts to establish a background for a criminal prosecution which culminated in a jury trial in which [Coleman] was charged with two counts of [t]heft from the Elks, one count of [t]heft from the YMCA and one count of [c]onspiracy regarding the YMCA. Nothing in the record establishes any basis for a finding that ill will existed between [Coleman] and [] Defendants nor has [Coleman] produced any expert report addressing the issue of actual malice. As we noted previously, confusion in reporting is not a basis for a finding of malice. Simply put, nothing in the record suggests that this civil case should proceed further.

Trial Court Opinion, 12/4/2015, at 1-2 (pages unnumbered).

We first consider Coleman's claim that, based upon our Supreme Court's holding in **Weaver**, 926 A.2d at 905, Defendants' republication of statements after being notified of their false and misleading nature in itself constituted sufficient evidence of actual malice to survive summary judgment. Coleman's Brief at 38-39. A review of that case reveals that **Weaver** does not stand for that proposition.

Robin Weaver was a police officer who investigated the murder of Laurie Show. Lisa Lambert ultimately was found guilty of the murder. **Id.** at 901. Following Lambert's conviction, Lawrence Yunkin, a man who had relationships with both Show and Lambert, confessed to having committed the murder with another woman. **Id.** at 901 n.1. A federal district court subsequently granted Lambert *habeas corpus* relief, indicating in its published opinion that Weaver and other members of his police department fabricated and destroyed evidence and perjured themselves, and that Lambert accused Weaver and two other officers of raping her. **Id.** at 901.

During the public discussion that followed, Oscar Brownstein wrote a letter to the editor, published in Lancaster's *Intelligencer Journal*, which provided in pertinent part as follows:

> Now here is an unanswered question: How did Officer Robin Weaver—who knew Lambert and Yunkin, and who presumably led two other policemen into Lambert's apartment—know that Lambert would be home alone, that the door to the apartment had been broken by Yunkin in a fit of anger, and that Yunkin

- 14 -

> would not return while they were allegedly raping Lambert at gunpoint? Of course, maybe Lambert just made up the whole story, knowing that five years later Weaver would be arraigned for the sexual abuse of women and children. Sure.

*Id.* Weaver sued Brownstein and the newspaper, claiming that he did not rape Lambert, was never charged with raping Lambert, and was never arraigned for the sexual assault of women and children. *Id.* Three months after Weaver commenced his defamation action, Brownstein's letter was republished by a third party; there were conflicting accounts of whether the republication was done with Brownstein's consent. *Id.*

Brownstein moved for summary judgment based upon the lack of proof of actual malice. This Court affirmed, reasoning that "the fact that Lambert had accused Weaver of rape was a matter of public record, and therefore, Brownstein's repetition of the allegation did not constitute actual malice." *Id.* at 902. Regarding "the allegations that Weaver had been arraigned for the molestation of women and children," this Court "found that there was no evidence that Brownstein actually knew that his allegation was false, but rather he had merely confused Weaver's name with the name of another officer who had been arraigned for those crimes." *Id.* Finally, this Court held that the republication of the article three months after Weaver sued Brownstein for defamation was not relevant to Brownstein's state of mind at the time of the letter's original publication. *Id.*

Our Supreme Court granted allowance of appeal to consider "the question of whether the republication of a statement, after the defendant receives a complaint alleging that the statement is defamatory, is **relevant** to the presence of actual malice in the initial publication." *Id.* at 900 (emphasis added). In reversing this Court's holding that the defendant's "act of republication over a year later had no bearing on his earlier mental state," *id.* at 902, our Supreme Court held "that the republication is **relevant**" to the actual-malice determination. *Id.* at 900.

Thus, *Weaver* stands for the proposition that republication is **relevant**, not, as Coleman claims, that the fact of republication in itself "'constitutes sufficient circumstantial evidence of actual malice for the cause of action against [the publisher] to survive [its] motion for summary judgment.'" Coleman's Brief at 39 (purporting to quote *Weaver*, 926 A.2d at 905).[6]

---

[6] The paragraph from which Coleman took his quotation provides in full (on a page other than that cited by Coleman):

> We granted *allocatur* on a limited basis to consider whether under this Court's decision in **O'Donnell v. Philadelphia Record Co.**, 356 Pa. 307, 51 A.2d 775 (1947), [defendant] Brownstein's alleged actions in granting permission, in the post-complaint timeframe, to a third party to republish the disputed letter to the editor, constitutes sufficient circumstantial evidence of actual malice for the cause of action against Brownstein to survive his motion for summary judgment.

*Weaver*, 926 A.2d at 902.

- 16 -

Coleman further distorts **Weaver**'s import to the present case by citing it for the proposition that republication alone creates a factual issue as to actual malice. **See** Coleman's Brief at 39 ("[O]nce it is clear that the republication is relevant, the record demonstrates that there is at least one fact in dispute that could support a finding of actual malice—the fact of republication itself." (citing **Weaver**, 926 A.2d at 905)). However, a reading of the quoted material, in context, reveals its fact-specific nature, and utter irrelevance to this case. The **Weaver** opinion provides:

> The Superior Court's concern that the republication only reflects a subsequent mental state goes to the weight of the evidence, not its admissibility. Once a court rules that evidence is relevant to an ultimate threshold of proof, in this case actual malice, any question of weight requires an assessment of the credibility of testimony and is, therefore, a question for the jury. Such considerations, however, have no role at summary judgment where the focus is whether the proffered evidence, if credited by a jury, would be sufficient to prevail at trial. This brings us to the second legal question presented by this case of whether there are genuine issues of material fact that should be decided by a jury. The Superior Court found that there were no disputed facts. However, once it is clear that the republication is relevant, the record demonstrates that there is at least one fact in dispute that could support a finding of actual malice—the fact of republication itself. In his deposition, Brownstein first admits that he gave permission for his letter to be reprinted, then denies any memory of whether or not he gave his consent to the republication. If the first is true, then Brownstein republished his letter, but if Brownstein did not consent to the letter's reprinting, then he did not republish his comments. Therefore, the material fact of republication is disputed.

**Weaver**, 926 A.2d at 906-07 (internal citations omitted).

In the instant case, there is no factual dispute as to Defendants' publication and republication of the statements about which Coleman complains. Accordingly, Coleman's argument that **Weaver** mandates reversal of the trial court's order is devoid of merit.

We next consider whether the record evidence as a whole, including the undisputed republication, "is sufficient to cross the constitutional threshold that bars the entry of any judgment that is not supported by clear and convincing proof of actual malice." **Joseph**, 129 A.3d at 436.

In opposing Defendant's motion for summary judgment, Coleman relied upon several pieces of evidence in attempting to meet his burden of showing that Defendants published the articles in question with knowledge of their falsity or reckless disregard for whether they were false.

Coleman contends that actual malice is shown by the "continued reporting that Adam Coleman was implicated in the theft of more than $100,000" after receiving notice from Coleman's counsel that it was false. Coleman's Brief at 20, 21-22. Coleman also points to Defendants' failure "to undertake any additional efforts to corroborate the truthfulness" of the information in the affidavit of probable cause. **Id.** at 20-21. Finally, Coleman claims that *The Express* was biased against Coleman's campaign for reelection "as evidenced by its violations of its own policies concerning candidate endorsements…." **Id.** at 24-25.

After comparing the allegations in Coleman's brief with the actual record evidence, we agree with the trial court that Coleman's proof did not amount to clear and convincing evidence that Defendants "in fact entertained serious doubts as to the truth of [their] publication[s]." **Manning**, 886 A.2d at 1144.

First, the source of the initial article was a press release from the OAG. Coleman has not produced any evidence to suggest that the OAG, as a governmental office, was not a reliable source. "[W]hile recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports, it simply cannot be concluded that a defendant entertained the requisite doubt as to the veracity of the challenged publication where the publication was based on information a defendant could reasonably believe to be accurate." **Curran v. Philadelphia Newspapers, Inc.**, 439 A.2d 652, 660 (Pa. 1981) (internal quotation marks and citation omitted).

Second, Coleman's denial of the charges under these circumstances "could reasonably have been dismissed as subjective statements not impeaching the integrity of the information supplied by the [government] source." **Id.** "As one court has stated, '[i]f potential plaintiffs in libel suits could cut off a [no-]malice defense simply by calling a newspaper and giving a broad denial of an article, the first amendment policy in **New York Times**

would be undermined.'" **Id.** (quoting **Martin Marietta Corp. v. Evening Star Newspaper, Inc.**, 417 F.Supp. 947, 960 (D.D.C. 1976)).

Nonetheless, Defendants did investigate beyond the press release from the OAG when Coleman's lawyer claimed falsity. Coleman acknowledges that defendant Runkle obtained and reviewed the criminal complaint and affidavit of probable cause. Coleman's Brief at 20-21. As detailed above, those documents confirm the information in the press release: over $100,000 was misappropriated, and Clark, Coleman, and Coleman's mother faced charges as a result.

Coleman avers that actual malice is suggested by Defendants' failure to investigate further by contacting Special Agent Shaffer, who signed the affidavit of probable cause, or Special Agent Conrad, who supplied information to Special Agent Shaffer. Coleman's Brief at 21. However, Coleman again fails to indicate what reason Defendants had to doubt the veracity of the special agents of the OAG who supplied the information. As such, the fact that Defendants did not contact the sources referenced in the affidavit does not constitute evidence that Defendants entertained serious doubts about the truthfulness of the information. **See**, **e.g.**, **St. Amant v. Thompson**, 390 U.S. 727 (1968) (holding actual malice was not shown although defendant relied upon a single affidavit as a source without knowledge of the affiant's reputation for veracity or lack thereof).

Finally, Coleman claims that actual malice is shown by Defendants' bias against his reelection campaign. Specifically, Coleman points to the decision to publish a letter to the editor from Kathy Wolfe about him entitled "Where is the outrage?" Coleman's Brief at 24-26.

By way of background, leading up to the 2011 general election, *The Express* solicited for publication letters from its readership supporting individual candidates. The self-imposed deadline for such submissions was October 28, 2011. Ms. Wolfe's letter was received after that date. There was some disagreement at *The Express* about whether to publish the letter because "even though it's not an endorsement, it's pretty much an anti-endorsement." Coleman's Brief at 26 (quoting the transcript of the deposition of *The Express* employee William Crowell at 79-80).

The letter provided as follows:

> I am writing about the recent charges brought against Commissioner Adam Coleman in relation to misappropriated YMCA funds. I am surprised that there have been no letters to the editor on this subject from our local community. Where is the outrage from our community members?

> I certainly hope that people are not accepting the lame explanations that have been given by Adam Coleman on why he felt it was okay to take a loan from a nonprofit organization. I realize that he is innocent until proven guilty in a court of law. However, Mr. Coleman's own words spoken at *The Express* Commissioner Candidate Forum are an admission of guilt; yet, he continues to plead "not guilty" for purpose of the legal proceedings.

> Let us assume that Mr. Coleman is telling the truth that he was under the impression that Mr. Clark had discretionary funds

available to him. Did he really think that the YMCA, a nonprofit organization, would allow Mr. Clark to use his "discretionary" funds for the purpose of covering membership dues to a country club for a friend? And, if Mr. Clark was allowed to use the funds for such purposes, why did he need to have a fake invoice in order to get the funds? If that is what he really believed to be an ethical use of "discretionary" funds, then I have serious concerns about Mr. Coleman's competence. Please … Mr. Coleman went to college. He surely had an ethics class. Even if he did not, he had to know this was wrong … oh, that's right, he told the investigator from the state [OAG] that he knew it was wrong, which is public information. Yet, he still claims to be "not guilty" and we're supposed to be ignorant enough to buy that claim.

Do we really want this man to be our county commissioner? I sure do not! Why is he wasting our taxpayer dollars with a "not guilty" plea when he already admitted that he took the money and he knew it was wrong? Let's join together in voting Mr. Coleman out of office on November 8 and send him and his mother a message that their behavior is unacceptable.

Motion for Summary Judgment, 8/14/2014, at Exhibit 16 (ellipses in original). The letter was prefaced with the following note: "*Our instructions on our editorial page concerning election-related letters had to do with "Candidate Endorsements" being run up to a certain time. This letter does not apply to that rule: this writer is expressing an opinion, not an endorsement*[.]" **Id.**

Even if the decision to publish Ms. Wolfe's letter did violate Defendants' self-imposed deadline, we fail to see how that has any bearing on whether Defendants published defamatory statements about Coleman while entertaining doubts about the truthfulness of those statements.

Further, as Defendants point out, a review of the entirety of Defendants' reporting on this matter reveals an absence of any suggestion of bias:

> [W]hile Coleman takes issue with the decision by *The Express* to publish the Wolfe letter, he ignores other reporting on the election by the newspaper that shows it had no bias against his campaign. *The Express* reported on Coleman's participation in a "Commissioner Forum" sponsored by the newspaper. At this forum, as reported by *The Express*, "Coleman thanked *The Express* for allowing him to get 'the white elephant in the room' out of the way and proceeded to tell his side of the story." Defendants devoted a full, front-page article to reporting Coleman's side of the story, in which he claimed "I was 'duped.'" Indeed the Wolfe letter was written in response to Coleman's claims on innocence that he expressed at the "Commissioner Forum."

Defendants' Brief at 34 (internal citations omitted).

Likewise, we are unpersuaded by Coleman's argument that *The Express*'s "continued publication of articles during the election cycle … even when nothing was happening in the criminal case" evidenced Defendants' intent "to maximize the detrimental effect on [] Coleman's re-election campaign." Coleman's Brief at 26. The prosecution of a public official who was presently running for reelection obviously was matter of public concern, and actual malice is not established by "ill will or a desire to increase profits." **Manning**, 886 A.2d at 1144.

Upon thorough review of Coleman's claims of error and the applicable legal principles, we agree with the trial court that the reporting was, at worst, negligent. **Compare** Motion for Summary Judgment, 8/14/2014, at Exhibit 11 (reporting that Coleman was accused of conspiring with Clark

regarding emptying the Elks grant account), *with id.* at Exhibit 6, Affidavit of Probable Cause at 1 (alleging instead that the Elks grant money "was misappropriated by Jerry Clark and Adam Coleman."). However, "[t]he fact that [Defendants] could have employed a higher degree of journalistic responsibility does not constitute actual malice. Mere negligence or carelessness is not evidence of actual malice or malice in fact." *Manning*, 886 A.2d at 1144 (internal quotation and citation omitted).

We conclude as a matter of law that Coleman did not present evidence that could lead a fact-finder to the clear conviction, without hesitancy, that Defendants published any false statements about him with actual malice. Accordingly, we hold that the trial court properly granted Defendants' motion for summary judgment.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/28/2016

- 24 -